251 So.2d 405 (1971)
Guerry SNOWDEN
v.
PEARL RIVER BROADCASTING CORP. et al.
David Terry BLACKWELL et al., etc.
v.
PEARL RIVER BROADCASTING CORP. et al.
John D. NEWMAN, M.D.
v.
PEARL RIVER BROADCASTING CORP. et al.
Nos. 8460-8462.
Court of Appeal of Louisiana, First Circuit.
July 30, 1971.
Rehearing Denied September 2, 1971.
Writ Refused October 18, 1971.
*406 Leon Sarpy, and Nathaniel P. Phillips, Jr., of Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, for appellants.
John W. Anthony, of Talley, Anthony, Hughes & Knight, Bogalusa, and France W. Watts, III, of Watts & Watts, Franklinton, for appellees.
Before LANDRY, ELLIS and BLANCHE, JJ.
LANDRY, Judge.
Defendant, Pearl River Broadcasting Corporation (Broadcaster) suspensively appeals the judgment of the lower court condemning it to pay plaintiffs, Guerry Snowden, Dr. John D. Newman, and David Terry Blackwell, damages in the sum of $4,000.00, $5,000.00, and $2,500.00, respectively, for defamatory statements aired over radio station WBOX, located in Bogalusa, Louisiana, and owned and operated by Broadcaster. The demands of the named plaintiffs, as well as those of plaintiff Joseph W. Blackwell, were dismissed as to C. A. Stewart Dairy, Inc., sponsor of the program on which the offending remarks were made. The named plaintiffs have devolutively appealed praying that their awards be increased, and that they have judgment in solido against Broadcaster and Stewart Dairy. Plaintiff Joseph W. Blackwell has appealed dismissal of his claim against both defendants.
Broadcaster's principal defense is that the alleged defamatory statements concern matters of public interest and are privileged under the First Amendment of the United States Constitution unless shown to *407 have been made with actual malice which burden plaintiffs assertedly did not discharge. Subordinately, appellant maintains that plaintiffs did not prove actual damages as required by LSA-R.S. 45:1351-1354, inclusive, particularly Section 1353.
The facts are virtually undisputed. Plaintiff, Dr. John D. Newman, is engaged in the general practice of medicine in Bogalusa. Guerry Snowden manages a drug store situated in Bogalusa, but he is not a druggist. The Blackwells are brothers and owners of an establishment located in Bogalusa known as the Pizza Shanty.
In January or February, 1968, Jerry Womack, defendant's treasurer, conceived and originated a live program entitled "Call and Comment" to be broadcast over defendant's facilities. The format of the program was that at the beginning of each program the announcer declared that a topic of current public interest, chosen by the station, would be the subject of that day's discussion. The listening public was then invited to call in and comment on the subject selected. The resulting comments were then broadcast over the air live. The program continued in this fashion from its inception until April 3, 1968, on which date the allegedly defamatory statements were made by an anonymous caller.
Customarily, the program was opened with the following introductory remarks:
"Good morning ladies and gentlemen it's time now for Call and Comment, heard each day Monday through Friday and brought to you, as a public service, by the C. A. Stewart Dairy, Inc. in cooperation with WBOX radio. Call and Comment is a public affairs program of WBOX radio, a program whereby we give you, our audience, an opportunity to express your views on various topics that we toss out for discussion.
"Topics that we will not discuss on Call and Comment are: Segregation, Integration, Religion and their related topics. Aside from this any topic of general interest, any topic where we can stimulate a discussion from you, our audience, we will entertain on Call and Comment * * *"
On April 2, 1968, announcer on the Call and Comment program mentioned a wire service news story indicating the prevalence of drug addiction in the United States, and declared that the topic for discussion on Call and Comment on April 3, 1968 would be "narcotics".
On the morning in question, after opening the program, defendant's announcer, Bill Jones, stated:
"Also this morning we might mention here, that if you call in we would appreciate your calling in, but at the same time in fairness to all people and jobs unless you are willing to identify yourself and to tell us who is calling, we would rather you would not use specific names or places. Again we say that unless you are willing to identify yourself and tell us who is calling, who you are, we would appreciate it if you would not use specific people's names or places of business. This is only fair to all involved."
The program continued with the foregoing request and admonition being repeated from time to time. Eventually the following conversation transpired:
"ANNOUNCER: Good morning, Call and Comment.
UNIDENTIFIED CALLER: Hello, I'm speaking about the Pizza Shanty. I don't think they sell dope there because I've known Joe Blackwell for a very long time.
ANNOUNCER: Well, Okay, and who are you?
UNIDENTIFIED CALLER: You said I didn't have to say my name so I'm not saying my name.
ANNOUNCER: Okay, Thank you."
*408 An uneventual call followed the above. Immediately thereafter, the following colloquy occurred:
"UNIDENTIFIED CALLER: I've been listening to your program every day for two or three weeks here.
ANNOUNCER: Yes, sir.
UNIDENTIFIED CALLER: And I've been noticing that its very evident that there is proof being narcotics been going around herein town at these certain places. The police know about it but the facts that I've heard over at the station and you all know about it. It looks like they could to down there and they could do something to the Pizza Shanty and stop this stuff.
ANNOUNCER: Sir.
UNIDENTIFIED CALLER: It's obvious that Doctor Newman is writing those prescriptions and Guerry Snowden is filling them and they are selling them down there.
ANNOUNCER: Who's calling please?
UNIDENTIFIED CALLER: But I've listened to your station enough to know that that's going on. And if enough people can call in and get this thing straightened out, we can stop that.
ANNOUNCER: Who's calling please?
UNIDENTIFIED CALLER: All these kids running around here getting in trouble like that.
ANNOUNCER: Who's calling please?
UNIDENTIFIED CALLER: Well I didn't hear anybody else say who they were.
ANNOUNCER: Okay.
UNIDENTIFIED CALLER: If they identify themselves, I will.
ANNOUNCER: Thank you."
The record discloses that Bogalusa is a city of 20,000 inhabitants. Bill Jones, Manager, Station WBOX, conceded that the station's broadcasting range covers a radius of 75 miles, which area includes about 500,000 potential listeners. Jones also acknowledged that tape recording equipment and delayed broadcasting apparata are available by means of which such programs could be edited or censored to delete objectional statements before they are broadcast. He admitted such equipment was not purchased because he did not feel that defendant corporation could bear the cost.
It also appears that prior to April 3, 1968, Larry Seal, Druggist, had complained to defendant's manager, Bill Jones, who conducted the Call and Comment programs, about derogatory statements concerning Seal's drug store on previous Call and Comment programs. Jones conceded Seal had made the complaint.
Following the controversial broadcast, the Bogalusa Police Department was besieged with calls concerning the program. Public reaction was such that the Chief of Police, on April 4, 1968, published a lengthy statement in the local daily press assuring the public that rumors of alleged widespread use of narcotics in Bogalusa were unfounded. The article further stated in effect that the characters of innocent persons were being maliciously slandered by unverified rumors that they were trafficking in narcotics.
Plaintiffs denied any connection with the illegal sale, handling or use of narcotics. Defendant made no attempt to prove the truth of the unverified accusations.
It is conceded by all litigants, and we so find, that the instant matter falls squarely within the ambit of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686, inasmuch as the subject of narcotics and alleged narcotics abuse is a matter of public interest of such magnitude as to fall within the privilege accorded free speech and discussion by the First Amendment of the Federal Constitution. Accordingly, as held in New York Times, above, *409 appellant may not be held liable unless it broadcast the offensive statements with knowledge of their falsity or with reckless disregard as to whether the statements were false or not. We also note our own LSA-R.S. 45:1351, which provides in effect that operators of radio stations do not incur liability for published defamatory statements unless it be shown that the operator has failed to exercise due care to prevent publication or utterance of such declarations.
We note that the doctrine announced in New York Times, above, has been recently extended to instances concerning alleged defamation of private individuals who become involved in an event or subject of public or general interest. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, 1971. We deem Rosenbloom, above, applicable in this instance.
The trial court held that by the format employed, appellant deprived itself of the ability to determine in advance what the substance of comments and statements would be prior to transmittal over the air. On this basis, the lower court concluded that malice or publication with reckless disregard of truth or falsity was established. We find that the record fails to establish that defendant had actual knowledge of the falsity of the statements broadcast.
We next consider whether defendant's conduct meets the test of "reckless disregard" as the term is applicable in cases of this nature. The criteria for determining "reckless disregard" is set forth in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, as follows:
"* * * These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.
"It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But New York Times and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against selfcensorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.
"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when *410 the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.
"By no proper test of reckless disregard was St. Amant's broadcast a reckless publication about a public officer. Nothing referred to by the Louisiana courts indicates an awareness by St. Amant of the probable falsity of Albin's statement about Thompson. Failure to investigate does not in itself establish bad faith. New York Times Co. v. Sullivan, supra, 376 U.S. at 287-288, 84 S. Ct. at 729-730, 11 L.Ed.2d at 710-711, 95 A.L.R.2d 1412. St. Amant's mistake about his probable legal liability does not evidence a doubtful mind on his part. That he failed to realize the import of what he broadcastand was thus `heedless' of the consequences for Thompson is similarly colorless. Closer to the mark are considerations of Albin's reliability. However, the most the state court could say was that there was no evidence in the record of Albin's reputation for veracity, and this fact merely underlines the failure of Thompson's evidence to demonstrate a low community assessment of Albin's trustworthiness or unsatisfactory experience with him by St. Amant." (Emphasis by the Court.)
Appellant argues that under the above controlling test, no liability attaches because failure to investigate does not per se establish bad faith, and the record does not show that defendant entertained serious doubts as to the truth of the statements broadcast.
The question here presented is whether a radio station, having invited the public to speak freely through its facilities on a matter of public interest, is impressed with the duty of preventing such persons from making defamatory statements over the air. We would have no difficulty in finding a station liable, if it received defamatory material from an anonymous source, and broadcast the report without attempting verification. The direct broadcast of such anonymous defamatory material, without the use of any monitoring or delay device, is no less reprehensible in our judgment. The publication, in either event, is done by the station, and we find that there is the same reckless disregard for the truth in each instance.
The procedure employed amounted to an open invitation to make any statement a listener desired, regardless of how untrue or defamatory it might be, about any person or establishment, provided only that the declarer identify himself. The announcer's qualifying remarks did not even remotely indicate that unfounded remarks were out of order, or that statements and accusations should be based on personal knowledge, or that mere rumor, speculation, suspicion and hearsay would not be permitted. The clear import of the announcer's remarks was that an identified caller was free to make such accusations as he chose. To the uninitiated, at least, it extended both the privilege and opportunity to make any statement whatsoever, provided only that the declarer shed the cloak of anonymity. It also inferred that disclosure of identity would render a certain degree of respectability and propriety to such charges and accusations as might be made against named individuals. Appellant could have effectively monitored the program by the use of tape recorders or delayed broadcast equipment. For the reasons above noted, it did not choose to do so. It is contended the announcer terminated the anonymous call as soon as possible under the circumstances. The quoted excerpt from the broadcast does not support this argument. At no time was the caller informed that his interview would be terminated if he did not identify himself. The announcer merely requested that the caller disclose his identity, and concluded by thanking the caller when the caller finished his statement. We find that the style utilized encouraged the utterance of defamatory statements with utter disregard *411 of their truth or falsity. Appellant placed itself in a position fraught with the imminent danger of broadcasting anonymous unverified, slanderous remarks based on sheer rumor, speculation and hearsay, and just such a result actually occurred. Such an eventuality was easily foreseeable and likely to occur, as it in fact did. In our judgment, the First Amendment does not protect a publisher against such utter recklessness.
Plaintiffs' demands against Stewart Dairy, sponsor of the broadcast in question, were properly rejected by the trial court. The record discloses that said sponsor merely purchased a certain number of "spot commercials" for the purpose of advertising its business. It had no knowledge of the contents of the programs on which its ads would appear. Neither did it have any control over the format of the programs on which the purchased commercials would be broadcast. The time and the occasions on which the commercials would be broadcast were subject entirely to the discretion and control of Broadcaster. Under the circumstances, we find no merit in plaintiffs' contention that Broadcaster was the agent of the sponsor in this instance, thus rendering the principal solidarity liable.
We hold that the accusations in question are defamatory per se. The illicit sale and distribution of narcotics and drugs is, in our judgment, a most despicable crime. An individual against whom an unfounded accusation of such nature is lodged, suffers incalculable loss of reputation and irreparable loss of public respect and esteem. One so indicted is invariably held in public contempt and disdain.
Broadcaster maintains that plaintiffs are entitled to no damages whatsoever because there is no proof in the record of actual monetary damages sustained as required by LSA-R.S. 45:1353, which reads as follows:
"In any action against any owner, licensee or operator, or the agents or employees of any owner, licensee or operator, of a visual or sound radio broadcasting station or network of stations for damages for any defamatory statement published or uttered in or as a part of a visual or sound radio broadcast, the complaining party shall be allowed only such actual damages as he may prove. Acts 1950, No. 468, § 3."
The record shows that during the years 1967, 1968 and 1969, Dr. Newman's gross income increased substantially during each succeeding year. It further reveals that Dr. Newman could not point to any specific patient he lost as a result of the broadcast in question. Plaintiff Snowden, the salaried manager of a drug store, suffered no decrease in salary following the broadcast.
Considerable testimony was adduced concerning the financial affairs of the Pizza Shanty following the broadcast. It suffices to say that ensuing losses, if any, are not shown by a preponderance of evidence to have resulted to its owners, David Terry Blackwell and Joseph W. Blackwell, because of the broadcast of April 3, 1968. It also appears that about April 25, 1968, Joseph W. Blackwell sold his interest in the Pizza Shanty to his brother, David Terry.
Prior to the advent of LSA-R.S. 45:1353, it was the established jurisprudence of this state that all defamation is actionable, without specific proof of pecuniary damages because the interest protected is a person's reputation. Simms v. Clark, La. App., 194 So. 123. It has also been held that a person's reputation is his property, and more valuable than property. Kennedy v. Item Company, 213 La. 347, 34 So. 2d 886.
On at least two occasions since the adoption of LSA-R.S. 45:1353 (Act 468 of 1950), it has been held that, in cases of this nature, damages are recoverable notwithstanding the failure to establish *412 measurable damages. LaMartiniere v. Daigrepont, La.App., 168 So.2d 370; Greenberg v. DeSalvo, La.App., 216 So.2d 638.
In Greenberg, above, it is stated that liability for defamation, where no measurable damages are established, is predicated on LSA-C.C. art. 1934(3), which provides in part as follows:
"3. Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. * * *
In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, * * *."
We are of the view that LSA-R.S. 45:1353 merely codifies prior jurisprudence to the effect that one must suffer damages to recover. The statute does not purport to require proof of a dollar and cents valuation of loss as a prerequisite to recovery of damages. What the statute does mean is that there must be damages suffered in order to recover.
Our cases likewise hold that where damage to reputation or business is concerned, much discretion is vested in the courts because of the obvious difficulty involved in proving damages of such nature. Gladney v. DeBretton, 218 La. 296, 49 So.2d 18; Greenberg v. DeSalvo, above. We note that in Greenberg, above, an award of $1,500.00 for defamation of an attorney-at-law was increased by our brothers of the Fourth Circuit to $4,500.00. We cannot say, as a matter of law, that an award of $5,000.00 to a practicing physician constitutes an abuse of the discretion vested in the lower court. Neither do we find that the awards to the remaining plaintiffs exceed the discretion of the trial court.
Plaintiff-appellant, Joseph W. Blackwell, made no appearance in his own behalf during the trial below. The record discloses that shortly after selling his interest in the Pizza Shanty, he left Bogalusa, and has not since returned. Under the circumstances, we find no abuse of the trial court's discretion in disallowing his claim for damages.
The judgment of the trial court is affirmed, all costs of these proceedings to be paid by defendant, Pearl River Broadcasting Corporation.
Affirmed.
BLANCHE, Judge (concurring).
I concur in the result reached by the majority but for entirely different reasons.
I do not agree with my colleagues or counsel that the case here falls within the ambit of New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), requiring clear and convincing proof that a defamatory falsehood alleged as a libel was uttered with "knowledge that it was false or with reckless disregard of whether it was false or not." The knowing or reckless standard of New York Times, supra, has now been extended to apply to a state civil libel action brought by a private individual for a defamatory falsehood uttered in a news broadcast by a radio station about a private individual's involvement in an event of public or general interest. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296 (1971). My colleagues, as do counsel, assume that the subject of narcotics abuse is a matter of public interest of such magnitude as to fall within the privilege accorded free speech and discussion by the First Amendment of the Federal Constitution.[1] I *413 agree. However, I disagree that the plaintiffs' involvement therein was a matter of public or general interest.
The case here differs greatly from the Rosenbloom case, supra. There the police had arrested the plaintiff for distributing allegedly obscene magazines, and the radio station's subsequent broadcast concerned the individual's involvement therein. In the opinion, the Court stated:
"* * * It is clear that there has emerged from our cases decided since New York Times the concept that the First Amendment's impact upon state libel laws derives not so much from whether the plaintiff is a `public official,' `public figure,' or `private individual,' as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, `The System of Freedom of Expression' 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases. As our Brother WHITE observes, that is not a problem in this case, since police arrest of a person for distributing allegedly obscene magazines clearly constitutes an issue of public or general interest." Rosenbloom v. Metromedia, Inc., 91 S.Ct. 1811, 1820)
Factually unlike Rosenbloom, the radio station picked out the subject which they believed to be a matter of public or general interest and invited private citizens to comment thereon. Thereafter, one private citizen took the opportunity to defame other private citizens while on the discussion of a topic of general public interest, i. e., narcotics abuse. Granted that the general subject of narcotics abuse is a matter of great public or general interest, how does it serve freedom of speech or freedom of discussion on such subject matter for one private citizen to accuse falsely another of being involved therein? In my opinion, the protection of one's right to speak freely on public issues is not involved in such cases, and the protection afforded by the First Amendment is inapplicable.
The plaintiffs were in no way involved in the subject under discussion. They were only involved when an unidentified caller falsely accused them of being involved in the illegal sale of narcotics. Thus, their individual involvement therein was not a matter of public or general interest until after the call. Accordingly, the utterance did not concern an issue of public or general interest, and the New York Times standard does not apply.
I am of the opinion that the case here is governed by the general state law of defamation, and on that basis plaintiffs would be entitled to judgment.
NOTES
[1] As the majority of our Court and counsel has viewed the Supreme Court decisions, the knowing or reckless standard of New York Times will be applied whenever the subject under discussion is one of general or public interest regardless of an individual's involvement therein. If this is the law, then only the imagination delimits the manner and means by which any private individual can become involved in matters of public concern, and matters of public interest can become a vehicle by which one can defame another with practical immunity. I do not believe the Supreme Court ever intended such an absurd result, and in Time, Inc. v. Hill, 385 U.S. 374, 390, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967), the Court expressed caution against the "blind application" of the New York Times standard.