646 So.2d 967 (1994)
Leandrew BELL
v.
Larry RODDY, Citywide Broadcasting Corporation, et al.
No. CW 94 0298.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Rehearing Denied January 18, 1995.
*968 W. Steven Mannear, and Johnnie A. Jones, Jr. Baton Rouge, for PlaintiffLeandrew Bell.
A. Justin Ourso, III, Baton Rouge, for defendantsCitywide Broadcasting Corp., Peter Moncrieffe, Genevieve Stewart, Isiah Carey Arbuckle and General Ins. Co. of America.
R. Neal Wilkinson, Baton Rouge, for Larry Roddy.
Before CRAIN, FOIL and WHIPPLE, JJ.
FOIL, Judge.
At issue in this defamation action is whether the trial court erred in refusing to grant a motion for summary judgment filed by the defendants. We hold that the defendants are entitled to judgment as a matter of law, and reverse the judgment of the trial court.

BACKGROUND
Plaintiff, Leandrew Bell, alleging that he was the subject of defamatory statements broadcast on a live, open-mike radio talk show program, brought this defamation action against Mr. Larry Roddy, who uttered the comments. He also sued the radio station, Citywide Broadcasting Corporation; its insurer, General Insurance Company of America; its manager, Mr. Peter Moncrieffe; and the co-hosts of the subject radio broadcast, Ms. Genevieve Stewart and Mr. Isiah Carey Arbuckle (hereinafter collectively referred to as the "Broadcast Defendants"). He asserted that Mr. Roddy accused him of criminal conduct, and any statements and inferences made by Mr. Roddy relating to any criminal activity were false and malicious, resulting in injury to his private character, community reputation, and good name.
*969 With respect to the Broadcast Defendants, plaintiff alleged that the station and its manager were at fault for failing to install monitoring equipment to allow screening or censorship of "malicious defamatory messages to the public," and for failing to discourage and inform the public that when calling during a live open-mike broadcast, they should "refrain from making any false and unsubstantiated statements about any individual." Plaintiff further alleged that the station and its manager breached a duty to him in that it failed to supervise, instruct or teach its co-hosts or employees who answer the telephone lines how to receive, handle or disconnect telephone calls which tend to defame individuals. With respect to the co-hosts of the program, plaintiff asserted that they breached a duty to terminate the conversation once they were on notice that the caller was attempting to disseminate malicious and defamatory material to the public designed to injure his good name.
Plaintiff moved for summary judgment on the issue of liability, which was granted as to defendant, Larry Roddy. Mr. Roddy's suspensive appeal of that judgment was dismissed by the trial court for the failure to pay the estimated costs of the appeal. The Broadcast Defendants filed a motion for summary judgment on the issue of liability, which was granted by the trial court only as to the claim for infliction of emotional distress, but was denied in all other respects. The Broadcast Defendants requested that this court invoke its supervisory jurisdiction to review the propriety of the trial court's refusal to dismiss this defamation action.

SUMMARY JUDGMENT
A motion for summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966. In most cases, the burden of showing that there is no genuine issue of material fact is on the mover and all doubts must be resolved against the mover and in favor of a trial on the merits. Chaisson v. Domingue, 372 So.2d 1225 (La.1979). However, because the threat of nonmeritorious litigation may have a chilling effect on the constitutionally protected right of free speech, courts have employed a different standard for summary judgment in defamation cases. In order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate he likely will be able to meet his burden of proof at trial. Without such evidence, there is no issue of material fact, and summary judgment should be granted. Sassone v. Elder, 626 So.2d 345, 351 (La.1993).
In order to maintain an action in defamation, the plaintiff must prove: (1) defamatory words, (2) publication, (3) falsity, (4) malice, actual or implied, and (5) resulting injury. Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101 (La.1988). Proof of the truth of a defamatory remark is a valid defense in a civil suit for defamation. Id. at 1105.
In support of their motion for summary judgment, the Broadcast Defendants introduced numerous affidavits and exhibits. Plaintiff relied on the content of the statements and his insistence that the statements falsely accused him of criminal misconduct. The evidence on the motion for summary judgment showed the following: In 1991 and 1992, plaintiff was the Chairman of the Board of Directors and President of Eden Park Community Center Corporation of Baton Rouge, Inc., a non-profit corporation which ran two health clinics in Baton Rouge, Louisiana. One of the clinics was run at the Eden Park Community Center, owned and operated by the City-Parish of East Baton Rouge, pursuant to federal, state, and City-Parish grants. The other facility was run at the East Baton Rouge Parish prison under a contract with the City-Parish, which funded operation of the clinic.
In 1991, Mr. Samuel Campbell was hired by the Board of Directors as office manager of the prison clinic. Mr. Frederick Reed, who was the executive director of the clinics, was ordered by plaintiff to put the funds for the prison clinic in a separate account. Plaintiff told Mr. Reed that Mr. Campbell *970 would handle the administration of the prison clinic funds.
Sometime thereafter, Eden Park received notices from the Internal Revenue Service that certain payroll taxes had not been paid, which were attributable to the prison clinic payroll. Mr. Reed attempted to communicate with Mr. Campbell about the tax notices, but was unsuccessful. On May 18, 1992, Mr. Reed reported the unpaid taxes to the Eden Park Board of Directors. At the meeting, plaintiff stated that the matter of the unpaid taxes had been taken care of.
The following morning, on May 19, 1992, the subject broadcast aired during the "Question of the Day" program, which was hosted by Ms. Genevieve Stewart and Mr. Isiah Carey Arbuckle. Citywide's "Question of the Day" program is a live public forum program, during which comments from members of the public who call in to participate are broadcast live. Citywide does not have any delay or monitoring devices to screen or censor calls before they are broadcast. The hosts choose topics for the program on the basis of community interest. Prior to the subject broadcast, Mayor Tom Ed McHugh had been a guest on the "Question of the Day" program, during which callers expressed concern over access to medical care at the Eden Park Community Center. The station had also received calls concerning health care at the clinic on other occasions. On the basis of the community response, the co-hosts decided to make the Eden Park Community Center and health clinic the topic for the May 19, 1992 "Question of the Day" program. They invited plaintiff to participate, but he declined. Mr. Reed and two other panelists were guests on the program. During the program, Mr. Roddy called in and identified himself as a member of Eden Park's Board of Directors. The following represents the entire substance of Mr. Roddy's call to the program:
Mr. Larry Roddy:
Good morning Genevieve. I am so sorry that ya'll took so much time letting them talk. I am a board member, and I called in this morning after hearing this show. And I'm not calling in to put thrives (sic) against Linton or nobody.
But let me tell you this, Genevieve, and I'm going to be very quick and very blunt, too.
I came on the board some years ago, maybe two years ago, and I was brought on the board by Leander (sic) Bell as some of the people there today are throwing that name like I don't know what.
I was brought on not with the intention of what's going on the center, I wasn't given a package to find out what our operation, what's going on as a new board member. I was brought on to destroy and fire Fred Reed and get rid of Sharon Weston. Okay.
But somehow I saw that I was being laid as a dummy and not told the truth for what's going on. And I got down to the bottom of the board members, reading my package when I did, getting concern in coming over.
People must realize one thing. And I've had board, people that program say, whatever Leander (sic) Bell wants. There is an 18 board member there, 18. Leander (sic) Bell does not, and I'll bring you the minutes to show you, Genevieve.
In the minutes its says my money, that's not Leander (sic) Bell money. That's the 18 board members that serve on there.
When one person have done something wrong, all of us going to go to jail, not just one. And let me tell you.
I'd lick (sic) to bring this up right quick. There is a parish prison program and there is this program. We been under one ID number. Now all of a sudden there's been a proposal for another ID number, but there are some money problems with one of the these ID numbers. Money problems got to be paid.
The board chairman last night could say that this money's been paid, but could not show nothing in writing. I'm trying to get the board out of respect to understand we need these things in writing because you can be hammered legally.
This man has control over the old board members and he rules them, and he gets them to meetings when he wants. There are board members who don't even show *971 up for meetings. They come when he need them there.
And I would like to get down, and it don't have to be on a radio show, and sit down and get the Genevieve Stewart and the rest of the people to understand that there are some concerns for the other board members out there. I have a lot because I believe people come first. I believe the health center can grow.
And let me tell you this. Before we ever started getting any money, Fred Reed was out there doing all of this, bringing it there, and there were no concerns then, but when we started getting larger grants and big money, then the chairman would always hate to see this go through, hate to see that go through.
Let me tell you something. We are passed things.
Ms. Stewart:
What is your name, sir.
Larry Roddy:
I'm Larry Roddy, and I serve on the board and I'm proud to be on the board, but there's a lot of problems. And the problems are the chairman does not run that board by itself.
And if you go back and call for the tapes, if you call for the minutes, everything that you hear is the chairman runs this, I run this, this is my board. This is not Leander (sic) Bell board, and let me tell Councilman Linton, this is the board of 18 members serve on this board, not no one man.
Mr. Carey:
Mr. Roddy, so are you saying that there are some alleged underhanded criminal things going on with the board?
Larry Roddy:
There's a lot going on. I been asking it to come out, and I want it to come out. It needs to get on the bottom. Right now we owe money, and Mr. Fred Reed can tell you about, and Mr. Millican they were at the meeting.
We owe money for tax reasons, and it's not being paid. But yet still he's saying that they sat down on Thursday and got it straight. Mr. Reed met with the man a Friday it wasn't straight.
We got to stop playing games. I'm not going to jail for anybody for something that I don't have. Something I didn't do.
Mr. Carey:
All right. Thanks for calling this morning.
Following the meeting of the Board of Directors, Mr. Reed discovered that the taxes had not been paid and informed the Board of Directors. Subsequently, the Internal Revenue Service demanded that the Board of Directors of Eden Park Corporation pay the unpaid payroll taxes. Additionally, shortly after the broadcast, Mr. Graydon Walker, the Chief Administrative Officer of the City-Parish, requested that an audit be done to review the parish prison health clinic. The audit revealed that Eden Park failed to pay federal withholding taxes over a one year period in the amount of $98,935.00. The audit also revealed that Mr. Campbell received payments over the amount budgeted for his salary in the contract. Based on these findings, the City-Parish ultimately terminated the contract with Eden Park. The parish prison clinic was subsequently investigated by the District Attorney's office, which led to the indictment of Samuel Campbell for five counts of felony theft by a state grand jury.
In seeking to uphold the trial court's refusal to dismiss the defamation action against the Broadcast Defendants, plaintiff insists that the trial court's judgment in his favor on the issue of Mr. Roddy's liability constitutes the "law of the case," and precludes this court from considering whether the content of the statement was defamatory. Further, plaintiff insists that Mr. Roddy's statement clearly imputes that he had or was presently committing a crime, and constitutes "defamation per se," relieving him of the burden of proving the malice and falsity elements necessary to maintain the defamation action. Additionally, with respect to the liability of the radio station, plaintiff relies on Snowden v. Pearl River Broadcasting Corporation, 251 So.2d 405 (La.App. 1st Cir.), writ denied, 259 La. 887, 253 So.2d 217 (1971), wherein this court held a radio station liable for *972 broadcasting statements that accused the plaintiffs of trafficking in narcotics live on a radio call in program, where the station did not utilize any monitoring or delay devices. This court held that the plaintiffs in Snowden proved that the radio station had acted recklessly, and therefore, they successfully established the "actual malice" element necessary to prevail in a defamation action.
The Broadcast Defendants advance numerous legal arguments in support of their claim that summary judgment should be granted in this case. They allege that: (1) Mr. Roddy's statement is not defamatory as a matter of law; (2) Snowden has been overruled by subsequent United States Supreme Court decisions which place restrictions on the right of States to regulate communications through tort laws, and consequently, plaintiff must prove some "independent" fault on the part of the radio station, its managers and the co-hosts to recover; (3) plaintiff must establish "actual malice" in order to succeed and cannot do so; and (4) the comments by Mr. Roddy were privileged under several theories.[1]
We first dispense with plaintiff's "law of the case" argument. Under the "law of the case" doctrine, an appellate court generally will not, on a subsequent appeal, reconsider its earlier ruling in the same case involving the same parties who had their day in court, unless manifest injustice will result. Burns v. Sabine River Authority, 614 So.2d 1337 (La.App. 3d Cir.), writ denied, 617 So.2d 935 (La.1993). The doctrine simply does not apply when an appellate court reviews a ruling of a lower court, as the Louisiana Supreme Court held in Landry v. Aetna Insurance Company, 442 So.2d 440 (La. 1983). Accordingly, the fact that the trial court obviously found Mr. Roddy's statement to be defamatory as a matter of law in granting plaintiff's motion for summary judgment on the issue of liability as to Mr. Roddy does not preclude this court from considering whether those statements are defamatory.
A defamatory communication is one that tends to harm the reputation of another so as to lower him in the estimation of the community or deter others from associating with him. Sassone v. Elder, 626 So.2d at 352. The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is a question of law for the court, and is to be answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. Id.
A review of the context of Mr. Roddy's entire statement reveals that he made only two vague and ambiguous references to plaintiff. First, he complained of plaintiff's general leadership of the Board in the sense that plaintiff thought he was "running the show" instead of the 18 member Eden Park Board of Directors. We conclude that as a matter of law, there was nothing defamatory in Mr. Roddy's criticism of plaintiff's leadership of the board. Secondly, Mr. Roddy mentioned the "tax problem" in a vague manner, and stated that the "board chairman" (plaintiff) told him the previous evening that the "money problem" had been taken care of, but he did not produce written evidence that the money had in fact been paid. The Broadcast Defendants' evidence showed that this statement was entirely true: on the evening prior to the Broadcast, Eden Park's executive director reported the "tax problem" to the Board, informing the members of the unpaid payroll taxes, and at this meeting, plaintiff stated that the matter of the unpaid taxes had been taken care of. The only statement Mr. Roddy made that could imply potential criminal liability was not directed at plaintiff. Mr. Roddy expressed his concern over the "tax problem" that might subject the individual Board members to criminal liability. Mr. Roddy did not accuse plaintiff of being responsible for this tax problem; he only stated that it existed. And once again, the Broadcast Defendants' evidence proved that this statement was indeed true, as the IRS notified the Board of the payroll tax deficiency, and the "tax problem" resulted in the cancellation of the City-Parish contract *973 and led to the indictment of the manager of the prison clinic for felony theft.
Therefore, considering the entire context of Mr. Roddy's statement, we hold that Mr. Roddy's statements did not constitute actionable defamation as a matter of law. Because plaintiff cannot succeed in prosecuting this action against the Broadcast Defendants, the trial court erred in refusing to grant the Broadcast Defendants' motion for summary judgment. Accordingly, the writ is granted. Summary Judgment is rendered in favor of Citywide Broadcasting Corporation, Peter Moncrieffe, Genevieve Stewart, Isiah Carey Arbuckle, and General Insurance Company of America. (collectively, "Broadcast Defendants"). All costs are assessed to plaintiff.
WRIT GRANTED. SUMMARY JUDGMENT RENDERED IN FAVOR OF "BROADCAST DEFENDANTS".
NOTES
[1] Because we find that plaintiff cannot establish that the statements were defamatory, we pretermit discussion of all other issues raised in this appeal.