**AIRLIE FOUNDATION, INC., and Murdock Head, Plaintiffs,**

v.

**The EVENING STAR NEWSPAPER COMPANY, Defendant.**

**Civ. A. No. 2277–68.**

United States District Court, District of Columbia.

Jan. 20, 1972.

David N. Webster, Washington, D. C., for plaintiffs.

Francis L. Casey, Jr., Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

GASCH, District Judge.

This matter came on for consideration of defendant's post-trial motions for judgment n. o. v or in the alternative for a new trial. In accordance with established procedure, defendant made a timely motion for directed verdict upon which ruling was reserved. The matter has been extensively briefed and fully argued in open Court.

### I. FACTS.

Material facts as to which there is no dispute are set forth in the pretrial order. Plaintiff Airlie Foundation, Inc., operates a conference center in Fauquier County, Virginia, which is used for meetings by organizations with a wide variety of important interests. In addition, it has produced and distributed documentary motion pictures on such subjects as ecology and medicine. The individual plaintiff, Murdock Head, is a lawyer, physician, a member of the faculty of George Washington University and is the founder and principal guiding force in the operation of Airlie Foundation.

On September 14, 1967, Robert Walters, a reporter for the defendant Evening Star newspaper, with a few other reporters, attended a press conference at the home of William Higgs, at which each representative of the media was given a prepared sixteen-page statement. Mr. Higgs then discussed his press release with the newsmen. On September 14th, in its last edition, and on September 15th, in all four editions, the Star published articles relating to the Higgs press conference. Following an examination of Airlie Foundation's books by another Star reporter and the editor of the Star, a retraction of the charges against Airlie was published in the Star in two editions on both September 18th and 19th. The individual and corporate plaintiffs subsequently brought a libel action against the Star, and the jury returned verdicts of $100,000 and $419,800 compensatory and no punitive damages for the individual and corporate plaintiffs respectively.

The subject matter of the articles related to charges by Higgs that after an investigation conducted by himself and some of his associates he had concluded that Airlie Foundation was secretly financed and supported by agencies of the United States government, including the Pentagon, State Department, and Central Intelligence Agency. It is upon this charge and the underlying factual details upon which Higgs based his charges, as reported more extensively by the Star, that plaintiffs predicate their suit for libel.[1] Counsel concede that plaintiffs are "public figures" as that term has been defined by cases following New York Times v. Sullivan.[2] Clearly, the *Rosenbloom* case [3] extends the *Times* rule to this case, and the litigation has proceeded under that standard.

### II. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

In ruling on a motion for directed verdict or for judgment n. o. v. by a defendant, the Court must consider whether the plaintiff has presented substantial evidence upon which the jury might reasonably and legally reach a verdict

---

1. Plaintiffs point to testimony by the Star's reporter that upon graduation from college he served for one year as an assistant to an officer of the National Student Association, that several years later he wrote a series of stories for the Star concerning covert financing of the NSA by the CIA and that notwithstanding his close connection with officers of the NSA during the period when the secret financing was carried out, he was completely unaware of these arrangements. They argue that the jury could infer from this testimony a predisposition and receptiveness on the part of Walters to the charges made by Higgs.

2. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

3. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

on the non-moving party's behalf.[4] Defendant's position in its motion is that the state of the evidence would not permit a reasonable jury to reach a finding of malice within the meaning of the *New York Times* case and its progeny. The Court understands the Star's basic contention to be that it did no more than publish a substantially accurate account of charges which were not obviously false made at a press conference on a matter of public interest by a person who was an apparently reliable source [5] and that this conduct falls within the protection afforded by cases such as Greenbelt Cooperative Publishing Ass'n v. Bresler [6] and Time, Inc. v. Pape.[7]

To begin with, in the *Greenbelt* case the Supreme Court concluded that the words complained of were not slander when spoken and noted that it was undisputed that the subsequent newspaper article fairly and accurately dealt with the circumstances in which the charges were made. In this case plaintiffs vigorously contend that the Star's articles contained facts not raised at the press conference and thus were not a substantially accurate account of the Higgs charges.

Time, Inc. v. Pape, as both counsel appeared to recognize, more closely parallels the present suit. In *Time, Inc.*, the complaint was that the Time article, in reporting and summarizing a report prepared by the United States Civil Rights Commission deleted the word "alleged" when commenting on charges made in a civil complaint filed by one who claimed to be the victim of police misconduct. Thus, Pape contended, the article made

it appear that both the national commission and Time proffered the charges as truth when in fact they were merely allegations of a complaint. After a number of hearings at the trial and appellate level, the Supreme Court ultimately upheld the trial court's grant of a directed verdict for Time. Noting the difficulties which confront the publisher of a statement made by someone else, as opposed to, for example, an investigative reporter's account of an event, the Court concluded that the Time story was a "rational interpretaton of a document that bristled with ambiguities." [8]

Plaintiffs contend that the *Time, Inc.* case is inapposite here for two reasons. First, they maintain that the entire series of stories printed by the Star, which appeared in three versions, contain several affirmative representations which do not find their source in the Higgs press conference but rather from independent investigation and comment by the Star. They assert that some of these additional details are false and that all were added by the Star to lend credence and support to the Higgs' charges. Thus plaintiffs contend that the Star has exceeded any protection afforded by *Greenbelt* and *Time, Inc.*, because the stories were no longer merely an account of the Higgs press conference.[9]

Second, plaintiffs contend that this case differs from *Time, Inc.*, in another crucial respect. In *Time, Inc.*, the reporter and researcher testified that they were well aware of the meaning of the word "alleged" but that their omission of that word, given the entire content and thrust of the Commission's report, was not a falsification of what they be-

4. Lapsley v. American Institute of Certified Public Accountants, 246 F.Supp. 389 (D.D.C.1965).

5. *See* Defendant's Prayer for Instruction Number 1 and Defendant's Supplemental Memorandum of Points and Authorities in Support of Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial at 2.

6. 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

7. 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

8. *Id.*, 401 U.S. at 290, 91 S.Ct. at 639, 28 L.Ed. 45.

9. In Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), the Second Circuit noted that selective reporting, particularly where it tends to lend credence to a predetermined result, is a factor to be considered on the issue of malice. 414 F.2d at 337.

lieved to be the Commission's position concerning the Pape incident.

Plaintiffs assert that in this case the Star had information in its possession which caused it to disbelieve or at least entertain serious doubts about the Higgs charges. They point to testimony by Mr. Newbold Noyes, Editor-in-Chief of the Evening Star, that on Thursday evening, after the Star's first publication of the story, he had called a personal friend at the CIA regarding the charges. Mr. Noyes testified he believed he was speaking to Mr. Richard Helms, the director of the agency, was told by Mr. Helms, on a personal basis, that there was no truth to the story, and that he believed him at the time. The exchange was as follows:

> Q: On September 14, 1967, in the evning (sic), Thursday evening, did you call the head of the CIA?
>
> A: I think I did.
>
> Q: And, was that Richard Helms?
>
> A: Yes, if I called him.
>
> Q: Did he tell you that there was no truth to the charge that the CIA had been funding Airlie House?
>
> A: Yes.
>
> Q: And, did you believe him at the time?
>
> A: Yes.[10]

According to Mr. Noyes, this conversation left him "considerably shaken as to my original impression as to the validity of Mr. Higgs' charges." [11]

The defendant argues in response that under the circumstances as they were known at the time the first story went to press on Thursday, the decision to publish was reasonable, that upon receiving Helms' denial, which admittedly cast doubt upon the story, the Star could not simply drop its coverage, and that its decision to publish the following day, this time focusing on Dr. Head's denials, was the only reasonable course open to it.

Without more, this contention might have merit. In the course of publishing a series of articles concerning "hot news" prepared under deadline pressure, it is highly likely that additional information will come to light or events will occur which will significantly affect the underlying story or present the situation from a different perspective. The

---

10. Tr. at 231. In response to questioning about the call to the CIA, Mr. Noyes stated in his deposition that ". . . we were told—in the first place the CIA declined officially to say anything —but Helms, if it was Helms, and I think it was because I believed it at the time, and he said that for our information there was no truth in this allegation at all." Noyes dep. at 60. At trial there was considerable questioning concerning the reference to the phrase "believed it" from Mr. Noyes' deposition. When first called by plaintiffs, Mr. Noyes testified that he believed the denial. Tr. at 231. Mr. Noyes resumed his testimony after the noon recess, at which time he indicated that he desired to clarify an earlier answer. As to his prior testimony regarding his belief in Mr. Helms' denial, he said that ". . . I was very much impressed by Mr. Helms' conviction with which he stated the fact that there was no truth in the story, but it is not true that after that conversation that I was certain that he was telling the truth any more than I was certain that Mr. Higgs was telling the truth." Tr. at 261.

He was then interrogated concerning the apparent inconsistency between his deposition testimony and his earlier testimony at trial. The questioning concerning his statement, "I believed it at the time," was as follows:

Q: Didn't you mean to convey to me when you gave me that answer that you believed Dick Helms was telling you the truth?

A: Well, I am not certain. It seems to me it may have been a question as to whether it was Helms I was speaking with.

Q: Did you mean to convey by that answer that you gave me that you believed you were talking to Dick Helms rather than that you believed what he said was true?

A: I think there was some uncertainty in my mind, and there still is whether I ever did call Helms. I recall that there was a conversation that did, as I say, shake me in my original impression as to the validity of Mr. Higg's (sic) charges."

Tr. at 262–63.

11. Tr. at 264.

publisher will inevitably be faced with difficult choices when confronted with further developments in the story. See Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296, (1971). But in this case the Star did more than merely attempt to extricate itself from a position as to which it appeared to have reservations after Mr. Noyes' call to the CIA official. Although the stories which appeared the following day highlighted plaintiff Head's denials,[12] it is undisputed that several details were included which did not appear in the earlier, pre-phone call story on Thursday.

The most significant of these details was the Star's treatment of the government's reaction to the story. The Thursday article stated that "a government source" denied the story. Notwithstanding the subsequent denial which Mr. Noyes received from his personal friend at the CIA, the Friday stories contained the statement "the CIA declined to comment on the charges, but government sources said the charges . . . were untrue." Viewed objectively this treatment portrayed the existing situation in an extremely misleading fashion. When questioned about the articles' affirmative representations that the CIA declined to comment, the Star reporter admitted that this was an untruth and was known to him to be untrue when he wrote it.[13]

The first two editions on Friday also contained statements concerning the financial status of Airlie Foundation, information which was not contained in either the Higgs statement or in the Thursday story. As reported by the Star, "the foundation's public tax returns for 1965, the last year for which records are available, shows $561,205 and total expenses of $49,684." The former figure presumably relates to income of the Foundation. At trial the Star reporter testified that he had obtained information concerning the financial operations of Airlie through his own research but that according to his notes the Star figures were inaccurate and that the expenses figure should have been printed as $549,684. He further indicated that his reason for inserting these details into the story was to show that Airlie had a substantial operating budget. This testimony conflicted with his earlier deposition about which he was interrogated and in which he conceded that the figures as printed in the Star article would tend to show a significant and unexplained disparity between income and expenses.[14] Mr. Noyes also testified that this would be his reaction to the figures as printed.[15]

Plaintiffs also point to the statement in the description of the Airlie facilities, a point not mentioned by Higgs, that the complex contained a radio tower. At trial there was testimony that this tower belonged to a commercial radio station on nearby property. While it is not clear that plaintiffs assert that the Star knew

12. When the Star's reporter was questioned by plaintiffs, he indicated he had called Dr. Head prior to going to press with the first story on Thursday and had received a denial in the form of a statement from Dr. Head. He did not testify that he had read the proposed story to Dr. Head nor could he recall precisely what details had been discussed. Plaintiffs argue that Walters intentionally withheld these details to prevent Dr. Head from refuting the specific points upon which the Higgs charge was based.

13. Tr. at 162–66. Mr. Noyes testified in this regard that it was not the policy of the Star to print untruths to protect CIA sources. Tr. at 231.

14. Walters indicated that at the earlier deposition he had had none of his notes or files with him. When called to testify he produced tax return forms on which he claimed to have transcribed figures he had extracted from a copy of the Foundation's tax return which was a matter of public record and which reflected an expense figure of $549,684. The difference between the figure in Walters' notes and in the Star story was explained as a typographical error, and counsel for the plaintiffs vigorously questioned Star personnel as to how this could have occurred in view of their testimony concerning special handling and editing procedures for sensitive stories.

15. Tr. at 267–68.

this for a fact, they cite it as an additional illustration of their contention that the Star added details which tended to lend credence to the overall impression of Airlie as a spy center capable of conducting clandestine operations.

In addition to the details added by the Star which had not been raised in the Higgs charges, plaintiffs contend that the Star repeated one of Higgs' allegations verbatim even though they knew it to be false and misleading. That statement referred to "an elaborate system of electronic bugging equipment" as a part of the Airlie facilities. When questioned, Mr. Walters conceded that he had been told by other Star reporters who had visited Airlie that the conference center's recording system consisted of open, visible microphones, but that he understood the meaning of the phrase to be that Airlie could secretly record meetings without the knowledge or consent of the conference participants.[16]

The Court is mindful of the high degree of importance and protection our Constitution attaches to the freedom of the press as a healthy and necessary force in our society; indeed, the phrase, the First Amendment needs "breathing space," has become so familiar as to no longer require citation. The Court also notes that the allegations made by Higgs at his press conference concern serious questions of governmental involvement in activities which had been the subject of controversy and widespread coverage earlier in the year when the CIA funding of the National Student Association was made public. Thus this case, albeit brought by one who is not a public official, involves many of the considerations dealt with in the *New York Times* case, the touchstone of constitutional libel law.[17]

As the Supreme Court has recently had occasion to emphasize, the publisher of a potentially libelous story is confronted with a particularly acute dilemma when the story which he feels may be newsworthy:

> purports to be descriptive of what somebody *said* rather than of what anybody *did*. Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the "truth" of such an indirect newspaper report presents rather complicated problems.

Time, Inc. v. Pape, *supra*, at 286, 91 S.Ct. at 637, 28 L.Ed.2d 45. This Court has previously alluded to the additional difficulties facing the publisher of a story containing "hot news" prepared under deadline pressure, particularly when the story is intended to be disseminated by a number of newspaper editions or radio broadcasts. Under those circumstances it is indeed possible that the publisher's initial evaluation of his story and his decision to publish will be undercut by subsequent developments. The Supreme Court has noted that these later events may have no probative value as they relate to earlier publications.[18] Nor should information which is revealed after the first publication, insofar as it bears on the publisher's investigative efforts, necessarily be taken as evidence of malice.[19] But while it is well estab-

---

16. Tr. at 185.

17. The Court notes, parenthetically, that while the charges and newspaper articles concerned secret · financing of Airlie Foundation by the CIA, testimony was elicited from some of the plaintiffs' witnesses which seemed to say that as far as they were concerned the injury to the reputations of Airlie House and Dr. Head flowed from the allegation that they were other than the neutral and impartial catalysts of detached scientific inquiry into important social problems which they held themselves out to be. See testimony of Dr. Amos Johnson, tr. at 419; testimony of Mr. A. William Bluem, tr. at 224.

18. Rosenbloom v. Metromedia, Inc., *supra*, 403 U.S. at 55, 91 S.Ct. 1811, 29 L.Ed. 2d 296.

19. *Cf.* New York Times v. Sullivan, *supra*, at 287, 84 S.Ct. 710, 11 L.Ed.2d 686.

lished that a failure to investigate, without more, is insufficient to give rise to liability,[20] once one has undertaken to conduct an investigation he should not be permitted to ignore with impunity the fruits of that investigation.

■ The Court recognizes the apparent inconsistency created by absolving one who fails to investigate and imposing liability upon one who does. But under the circumstances of this case that apparent inconsistency is merely superficial. Here the defendant attempted to obtain confirmation or denial of the charges from the Director of the CIA after initial publication. The Star's editor testified that he received an emphatic denial, one which, in his own words, left him "considerably shaken." Nevertheless, the Star again published an account of the Higgs press conference the following day. While the headline featured Dr. Head's denial, the text included several details not raised by Higgs, including, among others, the CIA refused to comment. Faced with this testimony and evidence there was a basis established with convincing clarity upon which the jury might well have concluded these details were known by the Star to be false and were added by it to lend credence to the Higgs charges at a time when it entertained serious doubts as to the validity of those charges. Accordingly, the Court concludes that the evidence was sufficient to go to the jury on the question of whether the Star published "with knowledge that it was false or with reckless disregard of whether it was false or not" as required by the New York Times case.[21] Defendant's motion for judgment notwithstanding the verdict is denied.

### III. MOTION FOR NEW TRIAL.

Defendant's motion for a new trial is grounded on four separate arguments. First, it objects to the Court's instructions to the jury, both in their entirety and as to specific isolated elements of the charge.

Several months prior to trial the Court advised counsel that it expected to fashion a charge based substantially on the instructions given in Goldwater v. Ginzburg, supra, which were approved by the Second Circuit. The Court notes that defendant raised no objection to a Goldwater-type charge until shortly prior to the conclusion of the trial when counsel submitted their prayers for instructions. Full argument was held on the instructions at the conclusion of which the Court made the required rulings and combined the appropriate parts of plaintiffs' and defendant's prayers into the format and applicable language of the Goldwater charge.

■ Defendant's contention, in essence, is that the factual situation in Goldwater was so significantly different from this case that the entire thrust of the Goldwater charge involves considerations that are inapposite here. The distinction emphasized is that the publisher in Goldwater was asserting his own charges, based on his own investigation and research, as truth whereas here the publisher was merely reporting charges made by someone else. It submits that following the New York Times case, two types of cases and two lines of authority have emerged. One involves a "truth asserting" situation, as exemplified by the Goldwater and St. Amant cases, supra; the other involves a "charge reporting" story and is dealt with by cases such as Greenbelt and Time, Inc., supra. It therefore concludes it was error to use the basic Goldwater-type charge and the standard from the St. Amant case that "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." [22]

---

20. St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

21. 376 U.S. at 280, 84 S.Ct. 710, 11 L.Ed. 2d 686.

22. St. Amant v. Thompson, supra, 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d 262.

The Court understands plaintiffs' theory of the case to be that notwithstanding the Star's assertion that it took no position in its own story with regard to the truth or falsity of the Higgs charges, it nevertheless engaged in a course of selective reporting in dealing with the charges. Specifically they contend that the Star omitted matters known to it which would have detracted from the charge or at least presented it in a more balanced fashion, that it added details, some of which it knew to be false, which tended to lend credence to the charge and that it did this at a time when it disbelieved or at least entertained serious doubts about the charge.

The Court has previously alluded to the difficult choices which must be made by the publisher of a story which emanates from a source other than his own reporters. The Supreme Court has concluded that under certain circumstances the publisher's exercise of judgment when faced with these choices must be protected to preserve the vigor of a free press.[23] But the Supreme Court has also had occasion to announce recently in a case involving "hot news" prepared under deadline pressure which came from a source outside the publisher, precisely the argument advanced by defendant here, that liability should not be imposed absent a showing that defendant " 'in fact entertained serious doubts as to the truth' of its reports."[24] Accordingly, the Court concludes that its use of language from the *Goldwater* charge and its inclusion of the "serious doubts" standard from the *St. Amant* case was not error.

■ Defendant also raises numerous objections to specific elements of the Court's instructions. Preliminarily, the Court repeats the axiomatic proposition that

the impact of a jury instruction "is not to be ascertained by merely considering isolated statements, but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied."[25]

■ Defendant concedes that the Court properly charged that a publisher's failure to investigate, standing alone, is insufficient to establish malice,[26] but contends it was error to instruct the jury that it might consider whether there was a failure to investigate, and, if so, whether it was justified under the circumstances.[27] As the Second Circuit has noted,

There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. (Citation omitted.)[28]

Defendant argues that the charge was unbalanced and prejudicial because it presented the protection afforded by the First Amendment as a qualification on the right of an individual to recover damages for libel[29] and conveyed an erroneous concept of the relative importance of the interests at stake. At page 1083 of the transcript, in charging that the plaintiffs must prove malice by clear and convincing evidence, the Court emphasized that this requirement flows from constitutional *guarantees*, and counsel for the defendant thoroughly discussed the importance of the First

23. Time, Inc. v. Pape, *supra*, at 290, 91 S.Ct. 633, 28 L.Ed.2d 45.

24. Rosenbloom v. Metromedia, Inc., *supra*, 403 U.S. at 56, 91 S.Ct. at 1826, 29 L.Ed. 2d 296.

25. Curtis Publishing Co. v. Butts, 388 U.S. 130, 156–57, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967).

26. Tr. at 1085.

27. Tr. at 1085–1086.

28. Goldwater v. Ginzburg, *supra*, 414 F.2d at 342.

29. Tr. at 1076.

Amendment in his argument to the jury.[30]

Defendant next cites a portion of the charge which it contends conveyed the impression that the First Amendment was somehow inapplicable to this case.[31] A fair reading of the full charge clearly reveals that this objection is simply a hypercritical attack on language taken out of the context of the instructions in their entirety. This conclusion is equally dispositive of defendant's assertions that the Court erroneously charged the jury that it could award damages if it found that plaintiffs had established a case of defamation [32] or that the jury was erroneously told it might consider what efforts were made to have the story checked by another reporter.[33] Neither of these challenged statements when read together with the remainder of the charge could have resulted in prejudice to defendant's position.

Finally, defendant contends that the Court's instruction on the burden of proof on falsity was faulty in that it did not place the burden on defendant [34] nor did it impose the proper standard.[35] These contentions are disposed of by Goldwater v. Ginzburg, *supra*, 414 F.2d at 338, 341. In outlining the elements of a libel action, the Court at page 1080 placed the burden of proving falsity on the plaintiffs.

■ It is the Court's conclusion that a new trial based on asserted errors in the instructions to the jury is not warranted.

■ Second, defendant argues that a new trial is required where the verdict is erroneous and contrary to law and to the clear weight of the evidence, a standard which is less demanding than that required for a directed verdict or judgment n. o. v.[36] The Court has discussed extensively its conclusions with respect to the state of the evidence in denying defendant's motion for judgment n. o. v. and concludes that the verdict was not contrary to the weight of the evidence and that a new trial should not be granted on that ground.

■ The third basis on which defendant contends a new trial should be granted is that the Court erred in admitting certain items of evidence and accompanying testimony. These items were charts which depicted in graphic and tabular form the disparity between actual and projected revenues for Airlie's conference center for the years following publication of the articles in question. Defendant's principal objections are that Mr. Ross, the chief financial officer of Airlie, was permitted to testify as an expert in contravention of procedures established by the pretrial order and that as a result of surprise, effective cross-examination was precluded. Further objection is made to the admission of figures based on actual and projected revenues, rather than profits or surplus, on the grounds that they were misleading and prejudicial. The Court notes that Mr. Ross' name and the substance of his testimony appears in Plaintiffs' Amended Supplement to Pretrial Statement filed September 22, 1971, a copy of which was mailed to defense counsel on August 30, 1971, and that interrogatories had been sent to Mr. Ross. Defendant's argument concerning inability to cross-examine effectively is simply false modesty; counsel was quick to point out the distinction between revenue and surplus and was permitted, in the presence of the jury, to modify the charts by writing in the latter figures next to the former. The Court concludes that the admission of the charts was not erroneous and that assuming there was

---

30. Counsel were afforded an opportunity to review the charge prior to final argument and the delivery of the instructions to the jury.

31. Tr. at 1077.

32. Tr. at 1095.

33. Tr. at 1086.

34. Tr. at 1082.

35. Tr. at 1080.

36. *See* Childs v. Radzevich, 78 U.S.App. D.C. 235, 139 F.2d 374, 376 (1943).

a deviation from the pretrial order regarding expert testimony, its impact on defendant's case was minimal.

■ Finally defendant contends that the jury's verdict was excessive. The standard to be applied is whether the award is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." [37] The Court is well aware of the "chilling effect" which the threat of potentially large libel verdicts poses to the exercise of First Amendment rights; for this reason damage awards in this sensitive area must receive particularly close scrutiny.

Plaintiffs predicate their claims for damages on certain actual losses they contend were sustained by Airlie Foundation and on injury to the reputations of Airlie and Dr. Head.

As to the former plaintiffs offered testimony on the financial history of the conference center's operations. Those figures were:

1964—$30,832.00 (deficit)
1965—$73,140.20 (deficit)
1966—$27,174.48 (deficit)
1967—$4,484.05 (surplus)
1968—$57,233.80 (deficit)
1969—$45,091.76 (surplus)
1970—$38,992.07 (surplus) [38]

As pointed out by defendant, however, the conference center first achieved a surplus in the year the articles were published, and the conference billings in October, 1967, the month after the articles appeared, were greater than in any preceding month of that year. Additionally defendant asserts that any loss sustained may not have been solely attributable to the impact of the articles. Upon consideration of all the evidence bearing on damages, it is the Court's view that the upper limit of a reasonable recovery for lost conference revenues is

$50,000, or slightly less than the deficit for 1968.

Plaintiffs also offered evidence concerning the alleged loss of grants or income for the production of documentary films. As suggested by defendant, however, it is entirely possible that such losses, if any, were caused by factors other than the publication of the articles. Among such factors may have been a decrease in the number of Airlie applications for grants, a cutback in spending by government agencies which ordinarily sponsor such films, a lessening of interest in the topics covered by the proposed films, or the general decline in economic conditions.

■ Plaintiffs also claim damages for the loss of reputation of Airlie Foundation and Dr. Head. Recovery of such general intangible damages is permissible without proof of actual loss [39] but they are extremely difficult to quantify. Insofar as the award is intended to compensate for lost reputation rather than to punish the defendant for wilful and wanton misconduct, a nominal recovery may be sufficient to vindicate the injury to reputation.[40]

Any such injury in this case would have been vastly reduced by the immediate and exhaustive efforts which the Star took to minimize the impact of the charge. Among these measures were the publication of a statement of correction and apology, advising the major wire services and the White House press secretary of the retraction and directing a special Capitol Hill dispatch of the edition which contained the retraction.

■ The Court concludes that the jury's verdict in this case was excessive under the appropriate standards. Accordingly, defendant's motion for a new trial is denied conditioned upon the consent to a remittitur by Airlie Founda-

---

37. Taylor v. Washington Terminal Co., 133 U.S.App.D.C. 110, 409 F.2d 145, 149, (1969), quoting Graling v. Reilly, 214 F.Supp. 234 (D.D.C.1963).

38. Tr. at 294–297.

39. Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649, 660.

40. The plaintiff in Goldwater v. Ginzburg was awarded compensatory damages of $1.00.

..

tion to all damages in excess of $50,000.-00 and by Dr. Head to all damages in excess of $10,000.00. Should plaintiffs elect not to remit and a new trial become necessary, it will be limited, to the issue of damages in accordance with Fed. R.Civ.P. 59(a). Counsel will notify the Court within twenty (20) days with respect to their decision regarding the remittitur.

So ordered.