366 So.2d 445 (1978)
Charles E. HOLTER, Appellant,
v.
WLCY T.V., INC., a Florida Corporation, Mike Halloran, an Individual, and Fireman's Fund Insurance Company, a California Corporation, Appellees.
No. 76-1490.
District Court of Appeal of Florida, Second District.
December 1, 1978.
Rehearing Denied January 2, 1979.
Philip W. Dann of Baird, Robinson & Dann, St. Petersburg, for appellant.
Chester L. Skipper of Lyle, Skipper, Wood & Anderson, St. Petersburg, for appellees.
OTT, Judge.
The plaintiff brought a libel action. The lower court denied defendants' motion for summary judgment. In due course the case came on for trial by jury. At the close of the plaintiff's case the lower court entered a directed verdict for defendants. We reverse on the ground that the question of actual malice was one for the jury.
In considering the correctness of an order granting a motion for directed verdict the losing party is entitled to every reasonable inference that may be drawn from the evidence. The evidence must be viewed in the light most favorable to the losing party, the usual standard for viewing evidence where a directed verdict is involved. Guam Federation of Teachers, Local 1581, AFT v. Ysrael, 492 F.2d 438, 441 (9th Cir.1974). The Ysrael court pointed out:
The standard against which the evidence must be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined ... is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the New York Times standard, the case is one for the jury, and it is error to grant a directed verdict, as the trial judge did in this case. [Emphasis in original.] Id.

We, therefore, next turn to the record for the evidence before the lower court. The evidence is best evaluated if laid out separately as to what occurred on each of two successive days.

*446 THE EVENTS OF NOVEMBER 8, 1973
On November 8, 1973 the following story was prepared by Mike Halloran  a reporter-photographer for WLCY T.V. The story was included on the 5:30 p.m. broadcast:
A very hush hush undercover probe by the State Attorney General's office[1] into the current operation of local government in Reddington [sic] Beach and it's [sic] sister community Reddington [sic] Shore's [sic] has uncovered possible serious irregularities with officials who are running those government's [sic]. According to reliable sources who refused to be identified the mayor of Reddington [sic] Beach, Charles E. Holter, who's been in office five years, has reportedly resigned effective January first of 1974 under strong suspecision [sic] that he's been implicated in embasselment [sic] and extortion of monies from private contractor's [sic] who wanted to build in the area ... but this has not been confirmed ... I've also been told that one of the three commissioner's [sic] in Reddington [sic] Beach will also step down pending the outcome of the corruption probe. People who live in Reddington [sic] also disclosed to me that a full team of undercover men are looking in to [sic] the practice's [sic] of all local government's [sic] within the beach communities here in Pinellas County because of those extreme irregularities... .
At about 3:00 p.m. on November 8, Mike Halloran received a phone call. The caller refused to identify himself. The caller stated that he was a resident of "one of the beach communities" (in Pinellas County) and suggested that an ongoing investigation was underway in "the beach communities." The caller then hung up. Halloran thought it was a crank call and that the caller didn't seem very reliable. He testified that he "didn't take it very seriously."
At about 4:15 p.m. Halloran received another anonymous phone call. Halloran testified that this "older, very stable voice led me to believe that he was somebody in government." He testified that the "voice even sounded like it possibly might be a county commissioner." When asked at trial whether he had one particular county commissioner in mind, Halloran declined to state which county commissioner it might have been. He said that it might have been one of two county commissioners. He declined to give any names. He also testified that he did not ask the anonymous caller if he were a county commissioner. Halloran related the essence of the call:
[This] person called me and said, "I have some news to relate to you concerning beach communities" that [an investigation] was taking place. I asked the person to disclose who he was. [The] person said, "I cannot disclose who I am because I am involved in the investigation." I asked him, "Well, what is the nature of this investigation?" Source said that, "Auditor General's investigation currently going on here in the beach communities of Redington Shores and Redington Beach." And he said that, "Some people will have to leave office because of the probe into their activities," and he related that Mayor Holter, along with another commissioner, would step down, would resign from their office.
Halloran received a third anonymous phone call at about 5:00 o'clock that afternoon. He stated that the gist of the 5:00 o'clock call was about the same as that of the 3:00 o'clock call, i.e., to the general effect that investigators were about in the beach towns. Caller number three simply said that she was a resident of the beach communities and declined to give her name.
The testimony of Halloran as to the order of events from the time he received the 4:15 anonymous phone call up to the time of the 5:30 news broadcast is at best vague and imprecise. Quite obviously, Halloran himself concluded that the story should be verified.
With reference to the verification, he indicated there were three telephone calls made: two by himself and one by a secretary in the news room. Halloran said that *447 he called both the local State Attorney's office and the Auditor General's office in Tallahassee. In each instance, according to Halloran, there was no one in a responsible position present and thus he was unable to confirm anything  not even whether an investigation was going on in the beach communities. According to Halloran, the secretary's call was to the Redington Beach Town Hall and she talked to a "clerk or somebody".[2] According to Mayor Holter, the secretary's call was received by a clerk and switched to him personally. The secretary asked Mayor Holter the correct spelling of his name, his marital status, how long he had served in office and whether he was resigning. Holter testified that the secretary gave no explanation as to why she was making her inquiry. This did not disturb him at the time since he had previously received information requests of this nature from newspapers and others. He accordingly answered her questions and included the fact that he had announced to the Redington Beach commission his intention to resign at the end of the current year. After these attempts at verification Halloran typed up the story and made a sound-on-film recordation for the 5:30 p.m. news telecast.
With reference to Halloran's doubts, we would point out that he characterized the 4:15 p.m. source and the information as "fairly reliable." He testified that he didn't think the contents of his report were false  at least prior to the 5:30 broadcast.
Prior to the 5:30 broadcast Halloran discussed the story with his two immediate superiors  Keller and Cleaver. Keller pointed out that the anonymous source could be a problem because they were so entirely dependent on this one source.[3] Keller told Halloran that "very much depended upon the reliability of the source." Keller testified that he was concerned about the reliability of the informant, but that Halloran assured him that he knew the person and that he felt that the information was reliable. Halloran stated that he and Keller justified the inclusion of this information in the 5:30 broadcast on the ground that it was consistent with their impressions, i.e., that the building boom in the beach communities was probably causing widespread corruption.[4] Halloran also spoke with Cleaver (news director and Keller's and Halloran's superior) about the story. They conferred just before the 5:30 broadcast. Cleaver asked Halloran whether he had made any calls to verify his information. Halloran said that he had and that the voice of the 4:15 caller "sounds familiar, sounds like maybe somebody on the [county] commission."[5]
After the 5:30 broadcast the WLCY switchboard received approximately ten calls. Halloran testified that he took five of the calls and that the girl on the switchboard took the others[6] Halloran testified that the general thrust of the calls was "positive", i.e., that they should continue their investigation into corruption in the beach communities. Four of the five callers were anonymous. According to Halloran, he took a fifth call which was identifiable at least to a certain extent. The fifth caller *448 identified herself as an elected official of Redington Shores (not Redington Beach). She mentioned that the citizens of Redington Shores had petitioned the Auditor General to make an investigation. She also stated that she was "surprised to hear Mr. Holter's (mayor of Redington Beach) name mentioned in the broadcast."[7]
After receiving these calls, and before departing from the station, Halloran discussed the calls "very briefly" with Cleaver who was in a hurry to make a speaking engagement. Halloran related to Cleaver the general tone of the calls, namely, that WLCY was urged to keep digging into this purported scandal in the beach communities. However, Halloran made no mention of the call from the elected female official of Redington Shores who had expressed surprise over Mayor Holter being mentioned in such a connection.
Mayor Holter[8] first learned of the 5:30 broadcast (he had been out to dinner and did not see the broadcast) when a friend called at about 8:00 p.m.
He immediately called WLCY. The receptionist said that no one would be there until 9:30 and that Holter should call back then. Instead of waiting, Holter called Cleaver's home. He spoke to Mrs. Cleaver who informed him that Mr. Cleaver was at the speaking engagement. Holter finally reached Cleaver at WLCY at about 9:30 p.m. Cleaver told Holter that he did not know too much about what was going on but that he would have Halloran call Holter as soon as he [Cleaver] could reach Halloran. Cleaver succeeded in reaching Halloran and at about 10:15 Halloran called Holter. According to Holter he told Halloran that none of what Halloran had broadcast was true except that he was resigning. Holter said that he told Halloran that he had his own reasons for resigning. He asked Halloran not to rebroadcast at 11:00 o'clock, but Halloran refused to give this assurance. Holter testified that when he asked Halloran where he obtained his information Halloran replied a "reliable source." When Holter asked who, Halloran's answer was "I can't tell you that." They made an arrangement to meet the next morning at Redington Beach Town Hall.
Halloran's version of the call was that the Mayor was "very upset" and talking in an "excitable voice." According to Halloran, Holter said "It's a mistake, couldn't be me, couldn't be my town, are you sure it's me." Halloran said that he did not recall whether the Mayor demanded that the story not be rebroadcast. Rather, Halloran stated that he thought the Mayor merely asked him if the broadcast was going to be repeated at 11:00 p.m. to which Halloran replied that it would be as far as he knew.
Halloran stated that this telephone call was the first instance in which it occurred to him that a "mix-up" could possibly be afoot. He was concerned because Mayor Holter was so upset. He conceded that he felt that there remained a lot of investigative work to be done.
*449 Prior to the 11:00 p.m. news WLCY did no updating and at the broadcast made no comment concerning the Mayor's denial or his assertion of the falseness of the piece. WLCY T.V. admitted that there was no technical reason that the 11:00 p.m. broadcast could not have been re-edited as late as 10:15 or 10:30 p.m. Thus, it was a conscious policy decision to go ahead with the rebroadcast without change or qualification.[9]

THE EVENTS OF NOVEMBER 9, 1973
On the next day  Friday, November 9  WLCY radio, both AM and FM, broadcast the story in much the same form as the two television broadcasts of the previous day. There was one broadcast each hour on AM and one on FM. Thus, between the hours of 7:00 a.m. and 3:00 p.m., there were sixteen separate broadcasts containing the story.[10] The radio broadcasts contained references to Holter's resignation because of alleged criminal activities.
In keeping with his promise during their conversation of the night before, Halloran (and Keller) arrived at the Redington Beach Town Hall at about 9:30 a.m. Present in the Mayor's office were two Redington Beach commissioners and the Chief of Police. Halloran and Keller (Keller armed with camera, lights and tape equipment) walked into the Mayor's office with television lights blazing, microphone on and tape recorder rolling and began firing questions at him. According to Mayor Holter, the tenor of the questions was to accuse him of extortion and embezzlement. He described Halloran and Keller as being brash, sarcastic, rude and abusive. Another witness described Halloran's attitude as one of "gross indifference."
Mayor Holter testified that Halloran said words to the effect that any time a politician resigns it is obvious he is a crook and that "all politicians are crooked." Moreover, another witness stated that either Halloran or Keller said that "whenever a politician resigns ... there is something wrong with the situation" and that "anybody in politics is suspect." In addition, Halloran testified that Keller made reference to Watergate.
At the outset we must distinguish between the 5:30 p.m. and 11:00 p.m. broadcasts. In its denial of defendants' motion for summary judgment, the trial judge suggested that if only the 5:30 broadcast were involved he would have little hesitancy in granting summary judgment for the defendants. With reference to the 11:00 broadcast, however, the trial judge felt differently:
A material question is whether Mike Halloran acted with respect to the [11:00 p.m. broadcast] with knowledge that a material portion thereof was false or with reckless disregard of whether it was false or not.

*450 The question of whether or not Mike Halloran acted in a manner which would give the plaintiff a right to recovery is a question for a jury to determine... .
At the close of plaintiff's evidence, however, the trial judge entered a directed verdict for defendants.
Our position is that the lower court erred in directing a verdict for defendants because reasonable men could very well conclude that the events transpiring prior to the 11:00 p.m. telecast and the repeated radio broadcasts on the following day constitute reckless disregard of whether or not the story was false (as to Mayor Holter), if not that Halloran actually knew it to be false. While it may be true that the reckless disregard test is too strict to support a conclusion that actual malice existed as of the 5:30 broadcast, we hold with reference to the 11:00 p.m. broadcast that facts exist that would support a conclusion that actual malice existed.
This case involves the standards or requirements for imposition of liability for libel upon any segment of the mass communications media.
As has occurred in so many areas of the criminal law, this field of civil jurisprudence has now been assumed in large measure, if not totally, by the United States Supreme Court. It is to that Court's decisions that this court must look for determination of the question presented.
The current constitutional standard governing libel actions was first enunciated by the United States Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
The New York Times decision has been referred to as "unquestionably the greatest victory won by defendants in the modern history of the law of torts." W. Prosser, Law of Torts § 118 (4th Ed. 1971). The cases following New York Times afforded the press even greater protection. However, as evidenced by the many concurring and dissenting opinions, there was a great deal of turbulence within the Supreme Court as to the boundaries of the New York Times rule. This turbulence has been especially noticeable with reference to the tortuous evolution of the "public official" and "public figure" doctrines and the rules governing the status of private persons.
In Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) the Court attempted to define the boundaries of the "public official" concept. Later courts, however, have generally disregarded this attempt to delimit the reach of the "public official" concept.
One year later, the Court extended the New York Times privilege to "public figures" in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
Then, in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) the Court extended the New York Times rule by applying it to all those involved in matters of public or general concern even if they were neither public officials nor public figures.
In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), however, the Court renounced the Rosenbloom extension of the constitutional privilege. The Court held that the New York Times privilege did not apply to purely private individuals even though involved in matters of public or general concern. Nevertheless, the Court stated that even a purely private individual could not recover punitive damages in a defamation action unless he established "a showing of knowledge of falsity or reckless disregard for the truth" under the New York Times standard.
In Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) the United States Supreme Court reaffirmed the Gertz holdings albeit finding the particular plaintiff did not fall within the Gertz definition of a "public figure."
The New York Times rule is as follows:
The constitutional guarantees require ... a federal rule that prohibits a *451 public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"  that is, with knowledge that it was false or with reckless disregard of whether it was false or not. [Emphasis supplied.]
376 U.S. at 279-80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.
The New York Times reckless disregard standard is strict. According to the Court in St. Amant v. Thompson, 390 U.S. 727, 731-32, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 267 (1968):
[T]he stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies.
As pointed out in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) a standard based upon simple negligence would not be suitable.
In the lower court treatment of the well-known "Pentagon Papers" case, United States v. New York Times Co., 328 F. Supp. 324, 331 (S.D.N.Y.) it was stated:
A cantankerous press, an obstinate press, an ubiquitous press must be suffered by those in authority in order to preserve the even greater values of freedom of expression and the right of the people to know.
In New York Times the Court pointed out that the first and fourteenth amendments embody our
[P]rofound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.
376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701.
There are, however, well defined limits upon the free press. In Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964) the Court pointed out that
[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.
As was pointed out by Chief Justice Warren in his concurring opinion in Butts:
Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers.
388 U.S. at 170, 87 S.Ct. at 1999, 18 L.Ed.2d at 1120. In Gertz the Court stated:
The need to avoid self-censorship by the news media is, ... not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.
418 U.S. at 341, 94 S.Ct. at 3007, 41 L.Ed.2d at 806.
In Rosenblatt the Court emphasized the importance of reputation and the protection given it by law:
"[I]mportant social values ... underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation."
The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being  a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself is left primarily to the individual States... . But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.
383 U.S. at 92, 86 S.Ct. at 679, 15 L.Ed.2d at 609 [Stewart, J., Concurring.]
The "harm" that results from the publication of false statements is seldom, if ever, made good by a retraction. As the Court in Rosenbloom pointed out:

*452 Denials, retractions, and corrections are not "hot" news, and rarely receive the prominence of the original story.
403 U.S. at 46, 91 S.Ct. at 1821, 29 L.Ed.2d at 313.
In Gertz the Court pointed out:
Of course, an opportunity for rebuttal seldom suffices to undo harm of a defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie.
418 U.S. at 344, n. 9, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.
With reference to verification, in Hill the Court pointed out the pitfalls of a requirement of absolute verification:
We create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with the impossible burden of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait, particularly as related to nondefamatory matter.
385 U.S. at 389, 87 S.Ct. at 542-43, 17 L.Ed.2d at 467.
On its denial of the motion for summary judgment, the lower court in the instant case stated that "what efforts [Halloran] made or caused to be made to verify the contents of the `reliable source' information are very nebulous to say the least." The "nebulous efforts" and the denial by the principal of any wrongdoing are similar to the factual situation in Butts. There, the Court pointed out that "little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account, to be published was absolutely untrue." 388 U.S. at 169-70, 87 S.Ct. at 1999, 18 L.Ed.2d at 1119 [Emphasis supplied.].
Also on point with the instant case was the situation in Rosenbloom. There, the respondent/radio station made two sets of defamatory broadcasts. The first set of broadcasts referred to petitioner's arrest for possession of obscene literature and the police confiscation of "obscene books."[11] The second set of broadcasts characterized petitioner's business as the "smut literature racket" and those engaged in it as "girliebook peddlers." Defendant's news director testified that their half-hour deadlines required them to rely on "wire-service copy and oral reports from previously reliable sources subject to the general policy that `we will contact as many sources as we possibly can on any kind of a story'." 403 U.S. at 37, 91 S.Ct. at 1816, 29 L.Ed.2d at 308. [Emphasis supplied.] It is important to note that in Rosenbloom the defendant/radio station relied on information supplied it by a high ranking police official. An identified and thought to be reliable police captain who was in command of the Special Investigation Squad of the Philadelphia Police Department was the source of the defamatory information. This is in stark contrast to the instant case in which the source was an anonymous telephone caller obviously not even an identified or known source let alone a "previously reliable source."
The Rosenbloom Court thought it significant that the radio station had relied on information supplied by a high ranking police official in its finding that there was no evidence in the record to support a conclusion that the radio station "in fact entertained serious doubts as to the truth" of its reports. St. Amant v. Thompson had laid down the requirement that "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed. at 267. The St. Amant Court stated that "[P]ublishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.
The logic of the Rosenbloom Court is persuasive where the source of information *453 was a high ranking policeman. However, where an anonymous tipster conveys the information, one would be hard put not to have serious doubts about the authenticity of the tip. Halloran, at best, felt the information from the anonymous source to be only "fairly reliable" and felt that quite a bit of investigative work remained to be done. Moreover, Halloran had little or no reason to deem the source reliable. He violated the practice in the trade  that anonymous calls are customarily relied upon for direction but not for information.[12] He not only relied upon the source for information, but he even embellished it. Halloran's explanation that he had told Cleaver prior to the broadcast that "the voice sounds familiar, sounds like maybe somebody on the [county] commission" was characterized by the lower court as follows:
[The] "reliable source" [was] subsequently reflected as being not only unreliable but also unknown.
Moreover, the fact that Halloran intimated to his superiors that he knew the source is especially significant. Neither Cleaver nor Keller  each of whom were superior to Halloran  made any effort to kill the story notwithstanding the fact that Halloran's reliance upon an anonymous source was in violation of trade practice. The major reason for their lack of action may very well have been due to Halloran's lack of candor with them.
Finally, Halloran admitted that after Holter called and told Halloran that the broadcast was totally false save the fact of his resignation, that it occurred to Halloran that a "mix-up" could possibly be afoot.
Halloran himself should certainly have had doubts prior to the 11:00 p.m. newscast. Two cases from the District of Columbia are illustrative on the "serious doubts" issue. In Davis v. Schuchat, 166 U.S.App.D.C. 351, 510 F.2d 731 (1975) the court found actual malice to exist in an action for slander. The defendant was an investigative reporter who made false statements about Davis, i.e., he told three people that Davis "had been convicted of a felony in New York." He made these statements in the ordinary course of his preparations for a news story on Davis pursuant to his admitted technique of "throwing a lot of things out in an interview just to get a response." The court held that at the very least the record could support a finding that there was reckless disregard and that the defendant/reporter in fact entertained substantial doubts about the truth of his statements. Interestingly, the court noted that the record was "replete with instances of evasiveness and contradiction" in the defendant/reporter's testimony. In light of this, stated the court, the trial judge would be justified in believing testimony to the effect that the reporter knew that his statements were false. The jury in the instant case could conclude that Halloran's testimony fit this mold.[13]
In Airlie Foundation, Inc. v. Evening Star Newspaper Co., 337 F. Supp. 421 (D.D.C. 1972) the court found actual malice to lie in a libel action. In this case, after publication of an article alleging covert financing of the plaintiff/foundation by government agencies including the CIA, the editor of the defendant/newspaper received a denial of the charges from the director of the CIA. Nevertheless, the newspaper published the second part of the series the next day. The article stated that "the CIA declined to comment on the charges," a treatment which the court found "portrayed the existing situation in an extremely misleading fashion." 337 F. Supp. at 426. The court *454 noted that "[the newspaper lent] credence to the Higgs charges at a time when it entertained serious doubts as to validity of those charges." 337 F. Supp. at 428. The court stated it was cognizant of "the difficult choices which must be made by the publisher of a story which emanates from a source other than his own reporters," 337 F. Supp. at 429, but that this was no excuse for the libelous publication.
In addition to the "serious doubts" standard, the Court in St. Amant required the defendant to have a high degree of awareness of the probable falsity of the statements at issue. See Garrison v. Louisiana, supra.
In both Gertz and St. Amant the Supreme Court stated that a mere failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, there must be a high degree of awareness of probable falsity.
In Airlie the court held: "while it is well established that a failure to investigate, without more, is insufficient to give rise to liability, once one has undertaken to conduct an investigation he should not be permitted to ignore with impunity the fruits of that investigation." 337 F. Supp. at 427-28.
That such "fruits" and a high degree of awareness existed in the instant case is supported by the record. Moreover, as pointed out in St. Amant:
The defendant in a defamation action brought by a public official cannot, . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [Emphasis supplied.]
390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267-68. This recognition by the United States Supreme Court of the danger of anonymous sources is most persuasive.
The decisions in one lower federal court and two state courts are informative with reference to the standards governing the reliability of sources. In Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir.1969) cert. denied 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), the defendant published an issue of Fact magazine a few months before the 1964 election. The issue was heralded as "The Unconscious of a Conservative: A Special Issue on the Mind of Barry Goldwater." The court found that among other things the author added innuendos to some quoted statements. The court stated that "[r]epetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports." 414 F.2d at 337. [Emphasis supplied.] In contrast to Ginzburg's reliance on newspaper articles, books and campaign literature, the reliance in the instant case was upon an anonymous source  surely worse.
In Snowden v. Pearl River Broadcasting Corp., 251 So.2d 405 (La. App.) cert. denied 259 La. 887, 253 So.2d 217 (1971) the court found actual malice. The defendant/radio station had a public interest program which members of the public could call. This was an "open mike" broadcast for which there existed no monitoring equipment or delay devices to edit out offensive comments. An anonymous caller stated that the plaintiffs were in the dope business. The court held that what the station did is the same as "if it received defamatory material from an anonymous source, and broadcast the report without attempting verification." 251 So.2d at 410. [Emphasis supplied.] The court went on to hold that:
The direct broadcast of ... anonymous [the caller chose not to identify *455 himself] defamatory material, without the use of any monitoring or delay device, is no less reprehensible [than using an anonymous source].
251 So.2d at 410.
In Mahnke v. Northwest Publications, Inc., 280 Minn. 328, 160 N.W.2d 1 (1968) the court found actual malice to lie in a libel action. A rewrite man for a newspaper had written a story with only limited verification attempted and even some negative verification present, i.e., a detective had stated that there had been a misunderstanding in the case. The court held:
[The] [d]efendant, prior to publication of the article, relied on one irate person as a source of information, whereas defendant/New York Times [in New York Times Co. v. Sullivan] relied on many reliable people, obtained certification that the individuals had consented to the use of their names in the advertisement claimed to be libelous, and made the determination prior to publication that the advertisement did not contain attacks of a personal character.
160 N.W.2d at 14. [Emphasis supplied.]
The lesson of Ginzburg, Snowden and Mahnke is that anonymous or otherwise suspect sources should be verified with care. Otherwise, as noted in St. Amant, recklessness may be found.
Appellees rely upon Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966) cert. denied 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967) for the proposition that the record in the instant case does not support a finding that Halloran published the defamatory material with a high degree of awareness of its probable falsity. With this we disagree. In Keogh the District of Columbia Circuit Court of Appeals reversed the district court which had denied the defendant/newspaper's motion for summary judgment. The circuit court held that a genuine issue of material fact had not been raised and that, accordingly, summary judgment was proper. The plaintiff (a United States Congressman) argued that the "character and content of the publication itself" was sufficient to show actual malice in light of the newspaper's failure to check the accuracy of the allegedly defamatory materials (syndicated columns by Drew Pearson) before publication. The court held  and no more  that reckless disregard of the truth could not be premised upon the failure of one of the many newspapers carrying Pearson's column to independently investigate the facts therein.[14]
In the recent Florida case of Cape Publications, Inc. v. Adams, 336 So.2d 1197 (Fla. 4th DCA 1976) cert. denied 434 U.S. 943, 98 S.Ct. 440, 54 L.Ed.2d 305 (1977) the jury returned a verdict in the amount of $114,000 (compensatory) and $100,000 (punitive). The Fourth District Court of Appeal affirmed, holding that the evidence sustained a finding that a newspaper and its employees exhibited reckless disregard of whether charges against a building official were true or false, i.e., that they published the articles with a high degree of awareness of the probable falsity of the statements involved and with serious doubts as to the truth of the publication.
In Cape Publications the plaintiff/Building Official of the City of Vero Beach was the subject of two articles published in Today newspaper. The gist of the articles was to accuse plaintiff of soliciting a bribe and other improper payments. The court noted that prior to publication of the two articles, defendants were aware of a number of facts which strongly suggested plaintiff's innocence. For example, the person (Bernard) from whom the bribe was allegedly solicited denied that this had happened. In addition, Bernard's supervisor (Wilcox), who had originally told Today that Bernard had reported the bribe solicitations to him, was evasive about the entire matter. In addition, the mayor of Indian *456 River Shores, who had purportedly been approached by plaintiff for payments for work which had already been completed, denied that this had happened. The mayor gave one of the defendants copies of relevant files (or told him where they could be obtained) bearing upon the open discussions between plaintiff and the Town Council of Indian River Shores relative to compensation for extra work performed by plaintiff for the town. Also, a neutral professional source who had been contacted by one of the defendant/reporters told that reporter that "he found no basis for any action against appellee and advised [the reporter] not to print any articles on the matter." Finally, it was common knowledge that one of the major sources of information alleging wrongdoing by the plaintiff had a running feud with the plaintiff.
The court held that the two articles were written "[i]n the face of all those red flags flying."
Cape Publications is significant authority for a reversal in the instant case. The "red flags" and negative verification level in the instant case were just as pronounced.
We think that a jury might reasonably have found, inter alia:
1. That the statement in the broadcast that the
[U]ndercover probe ... has uncovered serious irregularities with officials who are running those governments ...
was made without even establishing that an investigation was underway.
2. That although the broadcast referred to "reliable sources" there was, in fact, a completely anonymous and unconfirmed tip.
3. That Halloran violated the standards of his own profession by placing such reliance upon an anonymous source.
4. That Halloran knowingly misled his own superiors as to the reliability of the source.
5. That there was, in fact, no information that Holter had "reportedly resigned ... under strong [suspicion] that he has been implicated in [embezzlement] and extortion."
6. That the claim that "[a] full team of undercover men are looking into ..." was a pure fabrication.
7. That Halloran never had any reliable information that corruption was rife in Redington Beach.
8. That Halloran's efforts at verification were negative.
9. That the call from the elected female official and Holter's express and emphatic denial strongly indicated the falsity of the charges.
The directed verdict is set aside and the case remanded for new trial.
GRIMES, C.J., and BOARDMAN, J., concur.
NOTES
[1] Halloran testified that he meant to say "State Attorney" instead of "State Attorney General."
[2] Inexplicably, Halloran's impression was that the secretary was not able to reach Mayor Holter. At the time of the trial, the secretary did not remember ever making the call.
[3] Halloran admitted at trial that "other than knowing that [Mayor Holter] was resigning" he knew "nothing else other than what the source at 4:15 had told [him]."
[4] Halloran stated the basis of his "general impressions" was the constant growth situation in the small beach municipalities coupled with the incumbent difficulties of supervising such growth and the fact that such small municipalities were not so well equipped to handle such sudden growth. Halloran also stated that "news coming out of Washington", i.e., Watergate, had influenced his general outlook. Halloran admitted that he was without any actual information suggesting corruption in the beach communities until he received the anonymous calls. He testified that he "didn't have anything to substantiate there was any corruption going on."
[5] Cleaver testified that Halloran did not tell him that the source was anonymous.
[6] Keller testified that he took three of the calls. Nowhere in Halloran's testimony is there any mention of this.
[7] Keller testified, however, that he received a call from a female who "said she was at that time a commissioner, or had been a commissioner in a beach community ... that ... there was much problem ... in this beach community, and that there was an ongoing audit... ." Keller believed that this lady gave him her name and that he passed this along to Halloran. The record provides no clue as to whether these constituted two separate calls or were, in fact, one and the same. In his testimony Halloran makes no reference to Keller's role in receiving any of the calls.
[8] Mayor Holter had been mayor of Redington Beach since 1968. He was a retired petroleum engineer who occasionally served as a consultant for a period of two to fifteen weeks for oil refinery construction operations. He received no salary for being mayor, the job being sufficiently casual that in one instance when the sewer pumping station broke down on a weekend he himself went to repair it. In his three campaigns for office, Mayor Holter did no campaigning and received no campaign contributions. Mayor Holter's reasons for resigning were a combination of health (a bad back) and the fact that his consulting activities kept him away from Redington Beach so much. He testified that he "didn't feel [he] was giving the town a fair shake by being away." He had announced his intention to resign on the previous Tuesday night (the 6th of November), the resignation to be effective the first of the next year.
[9] After the recordation of Halloran's story had run, Cleaver (acting as anchorman) did state that Holter would make an on-camera statement the next day.
[10] RADIO:

According to Arbitron (ARB) reports, the following audience listened to WLCY AM and FM on a weekday between October 25, 1973 and November 14, 1973:
AM: 6-10 a.m. 251,000 persons in any given quarter hour
AM: 10 a.m.-3 p.m. 215,000 persons in any given quarter hour
FM: 6-10 a.m. 53,000 persons in any given quarter hour
FM: 10 a.m.-3 p.m. 80,000 persons in any given quarter hour
With reference to "cume persons" (the estimated number of persons who listened to a station for a minimum of five minutes within a specified day part), the following was estimated:
AM: 6-10 a.m. 1,842,000 persons
AM: 10 a.m.-3 p.m. 1,485,000 persons
FM: 6-10 a.m. 501,000 persons
FM: 10 a.m.-3 p.m. 537,000 persons
TV:
According to ARB, the four-week average of Thursdays, including November 8, 1973 shows that 30,000 households (49,000 persons) watched WLCY's 5:30 broadcast; 28,000 households (44,000 persons) viewed the 11:00 broadcast.
According to Nielson, 28,000 households (47,000 persons) watched the 5:30 broadcast; 16,000 households (24,000 persons) viewed the 11:00 broadcast.
[11] After the broadcasts, the radio station referred to the seizure of "reportedly obscene books." [Emphasis supplied.]
[12] Keller testified that stories were frequently killed where an anonymous caller refused to give a name and address.
[13] For example, it was pointed out at trial that Halloran  when being deposed  stated that the anonymous source did not actually use the word "embezzlement." Halloran stated that "he [the source] didn't come right out and say that." Halloran related that the source did use the phrase "possibility of extortion." Halloran maintained that although the source did not specifically name Holter as an embezzler or an extorter, the source merely said that Holter would possibly be involved in the investigation which was looking into embezzlement and extortion. In contrast, Halloran testified at trial that the word "embezzlement" was used.
[14] Cf. Menendez v. Key West Newspaper Corp., 293 So.2d 751, 752 (Fla. 3d DCA 1974) (also relied upon by appellees) which cited Keogh for the proposition that "where the issue is recklessness employed in the publication of alleged false and libelous information, that summary judgments should be more liberally granted." In Menendez, the court affirmed the circuit court's granting of summary judgment.